James W. CLIFFORD, individually and as Trustee of the Heirs and Next of Kin of Doris T. Clifford, deceased, petitioner, Appellant,

v.

GERITOM MED, INC., defendant and third-party plaintiff, Respondent,

Michael Gmitro, M.D., et al.,
third party defendants,
Respondents,

Bruce J. Mack, M.D., third party
defendant, Respondent,

Monica Myklebust, M.D., et al., third party defendants, Respondents.

No. CX–02–2041.

Supreme Court of Minnesota.

June 24, 2004.

## OPINION

ANDERSON, PAUL H., Justice.

In June 1999, Doris Clifford was an 84–year–old woman in reasonably good health for a person her age. She was recovering from a cold and was experiencing some discomfort as the result of phlegm. To relieve this discomfort, her physician prescribed a decongestant, Liquibid, but her pharmacy dispensed Lithobid, a drug containing lithium and used to treat bipolar disorder. Eight days after receiving the Lithobid, Clifford was admitted to a hospital where 11 days later she died of complications from lithium toxicity.

Clifford's estate sued Geritom Med, Inc., the pharmacy that dispensed the Lithobid. Geritom filed a third-party complaint against the prescribing physician, his nurse, and the physicians who later treated Clifford. The district court dismissed the third-party defendants. After Geritom asserted a different theory of liability, the court did allow the prescribing physician and his nurse to be included on the special verdict form for the purpose of apportioning fault. A jury found Geritom not negligent in Clifford's death. The jury also found the physician "and/or" nurse negligent, but found that this negligence was not a direct cause of Clifford's death. Clifford moved for judgment notwithstanding the verdict (JNOV) or a new trial. The

court denied the JNOV motion, but granted a new trial. A second jury found Geritom liable and Geritom appealed. The court of appeals reversed the district court's grant of a new trial. We reverse.

At 12:46 p.m. on June 17, 1999, Doris Clifford called the Phone Care number at Park Nicollet Clinics' central office. Clifford, age 84, was recovering from a cold and reported that her condition had "greatly improved" except for a phlegm problem that was making her feel uncomfortable. The nurse receiving the call faxed a handwritten note describing the nature of Clifford's call to Clifford's physician, Dr. Michael Gmitro. Dr. Gmitro's office is at Park Nicollet's Carlson Branch in Minnetonka. Dr. Gmitro returned Clifford's call, spoke with her about her request for something to treat the phlegm problem, and prescribed the drug Liquibid, a decongestant. Dr. Gmitro wrote this prescription on the same piece of paper with the Phone Care message. He then gave this piece of paper to his nurse assistant, Susan Duffy, R.N., so she could call Clifford's pharmacy to place the prescription order.

Duffy, who had worked at Park Nicollet for 13 years and had been a nurse for 30 years, does not remember the specific telephone call she placed to Clifford's pharmacy. However, information about the call is contained in an entry to Clifford's computer chart. This information was entered at 4:35 p.m. on June 17. After entering the information, Duffy discarded the paper with Dr. Gmitro's handwritten prescription. The computer chart entry states that

> dr. gmitro called and talked to doris, a prescription for liquibid # 60 ii bid was called into geritom pharmacy and it will be delivered to [Clifford's apartment building].

In essence, the entry reflects a prescription for 60 tablets of Liquibid, to be taken two at a time, twice a day, with no indication of any authorization for refills.

Respondent, Geritom Med, Inc., is the pharmacy to which Duffy telephoned Clifford's prescription. Geritom is a "closed-door" or "dispensing" pharmacy, meaning it primarily takes orders for prescriptions over the telephone and then delivers the prescriptions directly to patients. It serves developmentally disabled, mentally ill, and mentally retarded patients living in group homes and elderly patients living in senior apartments. Geritom pharmacist Daniel Sander Lee, Jr. answered Duffy's call and recorded the prescription on a telephone prescription form normally used by Geritom. Lee does not have any independent memory of Duffy's call. The prescription form contains the following information (*italics* indicate Lee's writing):

NAME: *Doris Cifford* [sic]

ADDRESS: *5/8/15* [Clifford's date of birth]

MEDICATION/STRENGTH: *Lithobid*

SIG: *# 40 2 tabs PO BID*

REFILL # : *1*

DR. NAME: *Mike Gmitro*

PHONE # : [omitted]

In essence, the information on this form reflects a prescription for 40 tablets of Lithobid, to be taken orally two at a time, twice a day, with one authorized refill. The drug Lithobid contains lithium and is used to treat bipolar or manic depressive disorders.

Geritom filled the prescription, as recorded by Lee, and delivered it later that day to Clifford's apartment building. The label on the bottle shows the contents to be Lithobid and contains the same instructions for taking the medication as were written on the form completed by Lee. After receiving the prescription, Clifford

apparently placed a small label of her own, in her own writing, on the Lithobid bottle with the words "Lithobid—Decongestant."

Eight days later, on June 25, Clifford arrived by ambulance at North Memorial Medical Center in Robbinsdale and was admitted to the Emergency Department. According to her chart, Clifford reported that she had gone to bed the night before in a normal state of health. Sometime in the middle of the night, however, she found herself on the floor tangled in her pajamas, experiencing lower extremity pain, and she had urinary and fecal incontinence. North Memorial records described Clifford as a "pleasant elderly woman."

Although Clifford appeared to be in good health at the time of her admission, hospital physicians decided to have her stay for additional testing. North Memorial's apparent practice is to continue administering a patient's preadmission prescriptions. To obtain Clifford's prescription information, her daughter-in-law, Jeanette Clifford, went to Clifford's apartment to obtain detailed information on Clifford's current medications. Jeanette Clifford then called a nurse at the hospital to relay this information from a list prepared by Clifford and from the labels on the medications. The information relayed to North Memorial by Jeanette Clifford included that obtained from the bottle containing Lithobid. North Memorial then dispensed drugs from its own pharmacy to continue Clifford's prescriptions in accordance with its standard practice.

At 4:00 a.m. on June 29, a resident physician was summoned to see Clifford. Clifford had suffered an acute decrease in mental status. She had decreased interaction with staff and was unable to "ambulate or verbalize freely." A lithium blood level was drawn and the Lithobid medication was stopped. North Memorial physicians also began an effort to clear the lithium from Clifford's system and her lithium level progressively dropped over the following days. Upon learning the Lithobid prescription may have been a mistake, Jeanette Clifford returned to Clifford's apartment to determine whether she had conveyed the wrong information to the hospital. After confirming that she had correctly read the label on the medication, she brought the bottle to the hospital where pharmacy staff verified that the tablets in the bottle were indeed Lithobid.

Despite the discontinuation of the Lithobid and the drop in her lithium level, Clifford never regained her preadmission mental status and her condition continued to deteriorate. Clifford died a week later at 11:37 p.m. on July 6. The Hennepin County Medical Examiner concluded that Clifford died of complications from lithium toxicity.

Two months after Clifford's death, on September 14, 1999, one of Clifford's sons, James Clifford, was named trustee of her estate. After his appointment, James Clifford individually and on behalf of his mother's estate commenced a wrongful death action against Geritom in Hennepin County District Court. The complaint alleged that Geritom negligently dispensed Lithobid instead of Liquibid and that this negligent act ultimately caused Clifford's death. In September 2000, Geritom filed a third-party complaint against Dr. Gmitro and Nurse Duffy (d/b/a Park Nicollet) and two North Memorial physicians. Geritom alleged that Dr. Gmitro and Duffy failed to "accurately and properly transmit" the Liquibid prescription and that the North Memorial physicians negligently failed to diagnose and treat Clifford's initial symptoms of lithium toxicity.

In June 2001, the district court dismissed without prejudice Geritom's third-

party complaint for failure to state a claim upon which relief could be granted. The court found that there was no common liability among the parties. In making this finding, the court determined that, even if it were true that Dr. Gmitro communicated the Lithobid prescription, at most Dr. Gmitro and Duffy were distinct and independent tortfeasors. Therefore, the court concluded there was no common liability between them and Geritom because the act of prescribing the wrong medication could not have been jointly performed. The court also found that even if it were true that the North Memorial physicians negligently treated Clifford, Clifford's cause of action against Geritom arose before her admission to North Memorial and the North Memorial physicians and Geritom could not be joint tortfeasors.

The court also addressed Geritom's liability in the context of any subsequent negligent treatment by the North Memorial physicians by quoting *Viou v. Brooks-Scanlon Lumber Co.*: "The mere fact that injuries caused by the negligence of the person sought to be charged have been increased by the negligence of an attending physician does not relieve that person of consequent liability." 99 Minn. 97, 103, 108 N.W. 891, 893 (1906). In addition, the court referred to the Restatement (Second) of Torts § 457 (1965) as setting the general rule for the scope of Geritom's liability in this matter. Section 457 reads as follows:

> If the negligent actor is liable for another's bodily injury, he is also subject to liability for any additional bodily harm resulting from normal efforts of third persons in rendering aid which the other's injury reasonably requires, irrespective of whether such acts are done in a proper or negligent manner.

The court concluded that if Geritom were found liable for the Lithobid error, it would also be liable for any subsequent harm to Clifford "from the treating physicians and hospital."

Before the start of the trial, Geritom moved to add Dr. Gmitro, Duffy, and the North Memorial physicians to the verdict form for the purpose of allocating fault under Minn.Stat. ch. 604 (2002). Specifically, Geritom claimed that it would present evidence on the "communication process" between Park Nicollet and Geritom and that a jury could find both parties at fault for any miscommunication. Clifford responded by arguing that the motion was an attempt by Geritom "to get in through the back door what [it] couldn't do through the front door and that is to be able to argue, despite the [district] [c]ourt's ruling, that these other individuals were negligent." The court granted the motion as to Dr. Gmitro and Duffy, but denied it as to the North Memorial physicians.

The district court denied Geritom's motion for a jury instruction on superseding cause, but also denied Clifford's in limine motion to prohibit Geritom and its witnesses from "arguing, submitting evidence, or otherwise mentioning that the previously dismissed third-party defendants contributed to or caused the death" of Doris Clifford. Clifford contended that this was necessary to prevent Geritom from arguing superseding cause. Geritom responded that Clifford had the burden of proving direct cause and Geritom was entitled to introduce rebuttal evidence that Clifford's ingestion of Geritom's Lithobid was not a direct cause of her death. Geritom asserted that one of its expert witnesses who was a doctor would testify that the Geritom-dispensed Lithobid ingested by Clifford was not a direct cause of her death. The court, in denying Clifford's motion, explained that Geritom had a right to defend itself by attacking direct cause and that, because there would be no supersed-

ing cause instruction, any testimony related to North Memorial could be "handled by cross examination." Ultimately, the physician whose testimony was proffered by Geritom did not testify.

The trial on Clifford's action was held July 23–27, 2001. Dr. Gmitro and Duffy testified, but were not represented. No persons connected with North Memorial appeared as witnesses. Geritom's attorney made a number of references apparently related to North Memorial's treatment of Clifford. During his opening statement, the attorney stated that Clifford had "only taken five pills" from the Geritom bottle, that North Memorial's pharmacy "refilled" the Lithobid prescription, and that the five Geritom tablets did not directly cause Clifford's death. Also on the trial's first day, Geritom's attorney questioned James and Jeanette Clifford on the subject of Clifford's apparent good health upon her admission to North Memorial and her declining condition while in the care of North Memorial.

Clifford's attorney did not object to the opening statement or cross-examinations, but apparently believed Geritom's conduct was improper and expressed this concern to the district court. The court's order and memorandum granting a new trial notes that Geritom's attorney was "admonished" the morning of the trial's second day "not to go any further into these matters." Nevertheless, later that same day, when cross-examining Clifford's expert pharmacist, Geritom's attorney asked several questions related to Clifford's consumption of Lithobid before and after admission to North Memorial. In prefacing one question, the attorney stated that Clifford had taken 14 tablets of Lithobid following the last time she took a "pill out of that [Geritom] bottle." In response to this line of questioning, Clifford appears to have requested a curative jury instruction

during a chambers conference the morning of the third and final day of the trial. The proposed instruction incorporated verbatim the text of Restatement (Second) Torts § 457 (1965). The court denied this request.

Aside from these apparent references regarding the issue of superseding cause, Clifford and Geritom introduced evidence specific to Clifford's negligence claim against Geritom. During the trial, Duffy testified that she had never heard of Lithobid or called in a prescription for it. After discussing the three discrepancies between the record of Dr. Gmitro's Liquibid prescription and Geritom's telephone prescription form, Duffy testified that if a pharmacist had repeated the prescription as Geritom recorded it, just one of the discrepancies would have caused her to correct the information.

Lee, the Geritom pharmacist who took Duffy's call, testified regarding his practice of repeating prescription information to callers in order to correct any discrepancies. Lee also testified that in the year leading up to Clifford's prescription Geritom had filled 30 Lithobid and 14 Liquibid prescriptions. Lee also acknowledged that Geritom does not include patient information inserts with the delivered prescriptions unless a patient specifically requests the information. Clifford's pharmacy expert testified that not including the patient information inserts did not violate any law or regulation, but that in his opinion Geritom's failure to follow this practice departed from the standard of care for pharmacies. This testimony was juxtaposed with Jeanette Clifford's earlier testimony about Clifford's careful behavior regarding her medications, including her practice of writing notes on the patient information inserts she received with medications dispensed from other pharmacies.

Geritom's pharmacy expert testified that Lee exceeded industry standards by repeating the prescription information and that "closed-door" pharmacies such as Geritom do not use patient information inserts on a routine basis. Geritom's owner, Thomas D. Smith, testified that Geritom offers in-person pharmacy counseling once a week at Clifford's apartment building and a Geritom pharmacist is available to customers by either telephone or pager 24 hours a day. Geritom also elicited testimony and introduced a Phone Care record regarding a call on June 23 by Clifford to Park Nicollet. The Phone Care record indicated that Clifford was concerned about a possible reaction to a medication she was taking for a bladder infection. There is no record of this call being returned by Dr. Gmitro or any other Park Nicollet doctor.

At the beginning of his closing argument on the third and final day of the trial, Geritom's attorney told an anecdote about circus clowns. This anecdote involved clowns who deceived an audience by making the audience think that a clown was shot out of a cannon into a net when actually it was a different clown who appeared in the net. Geritom's attorney ended the anecdote by stating "Things aren't always what they appear to be. Things are not always what they appear to be."

The jury started deliberations around mid-day on July 25 and returned the special verdict form on July 27. The jury answered "No" to the question "Was Defendant Geritom Med, Inc. negligent?" The jury answered "Yes" to the question "Were Dr. Michael Gmitro and/or Nurse Susan Duffy negligent?," but answered "No" to the question "Was such negligence a direct cause of the death of Doris T. Clifford?" Based on these answers to the special verdict interrogatories, the district court entered judgment in favor of Geritom. The court denied Clifford's subsequent motion for JNOV. However, the court granted Clifford's alternative motion for a new trial on liability on the ground the verdict was against the preponderance of the evidence.

A second trial took place March 19–21, 2002. At the conclusion of this trial, a jury found Geritom negligent and a direct cause of Clifford's harm. The jury found that Park Nicollet was not negligent. Following this second trial, Geritom moved for JNOV, a new trial, or reinstatement of the verdict from the first trial. The district court denied these motions. Geritom appealed, challenging the granting of Clifford's motion for a new trial following the first trial and requesting as alternative relief a new trial because of various alleged errors in the second trial. The court of appeals reversed and reinstated the first jury's verdict, concluding that the district court had abused its discretion in granting a new trial. *Clifford v. Geritom*, No. CX–02–2041, 2003 WL 21652269 (Minn.App. July 15, 2003). The court of appeals did not address Geritom's other issues. Clifford appealed and asks that we reverse the court of appeals by holding that the district court did not abuse its discretion in granting Clifford's motion for a new trial.

■ We begin our analysis by recognizing that a motion for a new trial gives a district court the opportunity to correct errors without subjecting the parties to the expense and inconvenience associated with an appeal. *Sauter v. Wasemiller*, 389 N.W.2d 200, 201 (Minn.1986). We have held that Minnesota Rule of Civil Procedure 59.01 establishes the causes for which a court may grant a new trial and limits the grounds for a new trial to those causes. *Ginsberg v. Williams*, 270 Minn. 474, 485, 135 N.W.2d 213, 221 (1965). Here, the relevant recognized cause for a new trial is when "The verdict * * * is not justified by the evidence * * *." Minn. R. Civ. P.

59.01(g). This cause "vest[s] the broadest possible discretionary power in the trial court." *Ginsberg,* 270 Minn. at 484, 135 N.W.2d at 220. Whether the verdict is justified by the evidence presents a factual question and the district court may properly weigh the evidence. *Lamb v. Jordan,* 333 N.W.2d 852, 855 (Minn.1983).

 A district court is in a better position than an appellate court to assess whether the evidence justifies the verdict and we usually defer to that court's exercise of the authority to grant a new trial. *Haugen v. Int'l Transp., Inc.,* 379 N.W.2d 529, 531 (Minn.1986); *LaValle v. Aqualand Pool Co., Inc.,* 257 N.W.2d 324, 328 (Minn. 1977); *Lamb,* 333 N.W.2d at 856. We will not reverse a district court's grant of a motion for a new trial absent a clear abuse of discretion. *LaValle,* 257 N.W.2d at 328; *Halla Nursery, Inc. v. Baumann–Furrie & Co.,* 454 N.W.2d 905, 910 (Minn.1990). When a jury's verdict indicates the jury was confused, we will "defer to the trial court's discretionary grant of the alternative new trial motion * * *." *Waite v. Amer. Fam. Mut. Ins. Co.,* 352 N.W.2d 19, 22 (Minn.1984).

 The applicable test for granting a new trial on the basis that the evidence does not justify the verdict is whether "the verdict is so contrary to the preponderance of the evidence as to imply that the jury failed to consider all the evidence, or acted under some mistake * * *." *LaValle,* 257 N.W.2d at 328. This is a demanding standard, but it is less rigorous than the standard for granting JNOV, which is "when the evidence is so overwhelming on one side that reasonable minds cannot differ as to the proper outcome." *Id.* Here, the district court's articulated basis for granting a new trial was that "the verdict [was] so contrary to a preponderance of the evidence presented at trial that the jury must have been acting under some mistaken belief." The court concluded that the jury's finding that none of the parties listed on the special verdict form was the direct cause of Clifford's death demonstrated that the jury's verdict "must have been corrupted by some mistaken belief or theory."

We note that Geritom does not dispute that Clifford died of complications from lithium toxicity. Further, according to the evidence, the only sources of lithium were the Lithobid dispensed by Geritom and that dispensed by North Memorial after it obtained information from the bottle of Lithobid dispensed by Geritom. The evidence also demonstrates that, when North Memorial obtained the information from the bottle of Lithobid dispensed by Geritom, it was following its policy of continuing preadmission medications. We concur with the district court's apparent conclusion that North Memorial would not have dispensed and administered Lithobid if not for the prescription information found on the bottle of Lithobid.

The significance of this conclusion is that it shifts the question of direct cause from which source of lithium was responsible for Clifford's death to who was responsible for the erroneous prescription information on the bottle of Lithobid dispensed by Geritom.[1] Thus, according to the evidence, negligence by either Dr. Gmitro "and/or"

---

1. We note that Clifford presented at least one other theory of liability, namely, that Geritom was negligent in failing to include an information insert with the Lithobid that would have alerted Clifford, who was very conscious about her medications, that there was an error. However, our discussion focuses on cau- sation as it relates to how the prescription information came to be on the bottle of Lithobid dispensed by Geritom. This focus is the result of our attempt to reconcile the jury's finding that Dr. Gmitro "and/or" Duffy were negligent without also being the direct cause of Clifford's death.

Duffy in communicating the information, or by Geritom in taking the information, would be the legal direct cause of the harm to Clifford. Of course, the jury could have found neither Dr. Gmitro and Duffy nor Geritom negligent, but it did not. It is the inconsistency between the jury's finding of negligence and its finding of no causation that indicated to the district court that the jury must have been acting under a mistaken belief. It appears that the court, upon reflection, must have realized the role of its decisions before and during the trial in either contributing to the jury's mistaken belief or in failing to prevent such a mistaken belief.

Geritom contends that in other instances we have upheld jury findings of negligence without causation and that we should do so here. However, the cases Geritom relies upon fail to support our upholding the first jury's verdict. In those cases, we upheld the jury verdict after determining that the jury could have considered theories wherein independent superseding forces intervened to cause the plaintiff's injury; i.e., the plaintiff would have been harmed under those circumstances even if the defendant had exercised reasonable care. *See, e.g., Hauenstein v. Loctite Corp.*, 347 N.W.2d 272, 276 (Minn.1984). In *Norberg v. Northwestern Hosp. Ass'n, Inc.*, we noted that the jury could have found that the plaintiff "would have been injured even if due care had been exercised." 270 N.W.2d 271, 275 (Minn.1978). In *Kilbane v. County of Ramsey*, we stated that the jury could have concluded that the plaintiff's injury would have occurred regardless of any exercise of due care because of an inevitable accident or self-infliction of the injury. 292 Minn. 86, 89, 193 N.W.2d 301, 304 (1971). In *Fallin v. Maplewood–North St. Paul Dist. No. 622*, we upheld a finding of negligence without causation after first noting expert testimony that a teacher cannot supervise every student at all times. 362 N.W.2d 318, 323 (Minn. 1985). We then concluded that the jury could have decided there was no causation between a teacher briefly leaving a wood-shop and a student's injury "because the accident happened quickly and because of the number of students in the room." *Id.* Here, we conclude the foregoing cases cited by Geritom are unpersuasive because in each of those cases superseding cause was legally cognizable and here the district court specifically denied Geritom's request for a superseding cause instruction.

Geritom also asserts that the jury's finding of no negligence on Geritom's part absolves it of any liability regardless of any confusion by the jury regarding causation. We disagree. We ordered a new trial in a similar case when a jury found a defendant not negligent, a third-party defendant negligent, but the third-party defendant's negligence not a direct cause of an accident. *Bergemann v. Mut. Serv. Ins. Co.*, 270 N.W.2d 107, 109–10 (Minn. 1978). In *Bergemann*, we observed that the verdict appeared to mean that the negligence of the third-party defendant "served to insulate [the defendant's] actions from a finding of negligence" because it "rendered otherwise unreasonable actions reasonable." *Id.* at 110. Here, because of the "and/or" framing of the interrogatory related to Dr. Gmitro and Duffy, it is unclear whether the jury believed Dr. Gmitro, Duffy, or both to be negligent. Like *Bergemann*, it is possible the jury believed Dr. Gmitro's apparent failure to return Clifford's June 23 call insulated Geritom from any prior negligence on its part.

The jury's finding of no negligence by Geritom also does not automatically absolve Geritom of any liability because negligence and causation in this case are so closely related that we cannot say the jury's confusion as to causation did not

taint its understanding of negligence. *Cf. Koenigs v. Werner,* 263 Minn. 80, 85, 116 N.W.2d 73, 76 (1962) (stating "the practice of permitting a partial new trial should not be followed unless it clearly appears that the issue to be retried is distinct and separable and that the trial of that issue alone may be had without injustice."). Indeed, the jury's finding of negligence on the part of Dr. Gmitro "and/or" Duffy is questionable as there was no evidence introduced that would provide an applicable standard of care. *See Norberg,* 270 N.W.2d at 275 (refusing to consider alternative theories of negligence not supported by a standard of care when attempting to reconcile a jury's finding of negligence without causation).

We conclude that the jury's finding of no negligence by Geritom when the jury made inconsistent findings on negligence and causation with respect to Dr. Gmitro and Duffy does evidence mistake or confusion by the jury. Therefore, after reviewing the evidence in this case, we have no reason to doubt the district court's determination that the evidence did not justify the first jury's verdict. As we noted earlier, the function of a new trial motion is to permit a district court a means of correcting errors short of an appeal. Accordingly, we hold that the district court did not abuse its discretion when it granted Clifford's motion for a new trial.

Our holding that the district court properly granted Clifford's motion for a new trial reverses the court of appeals on the only issue that court addressed on appeal. The alternative issues raised by Geritom before the court of appeals and not ad-

dressed by that court remain unresolved. Therefore, we remand this case to the court of appeals for consideration of Geritom's remaining issues in a manner consistent with this opinion.[2]

Reversed, vacated, and remanded.

BLATZ, C.J., took no part in the consideration or decision of this case.

---

**2.** In the memorandum attached to its order granting a new trial, the district court noted that the likely reason for the jury's mistake was the improper statements of defense counsel alluding to potential superseding causes. However, the district court's articulated ground for granting a new trial was that the evidence did not justify the verdict and we affirm on that ground. Because we conclude it was unnecessary for the court of appeals to address the issue of superseding cause, we vacate the court of appeals opinion to the extent that court directly or indirectly addressed this issue in its opinion.